UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

AMERICAN TYPE CULTURE
COLLECTION ("ATCC")
10801 University Blvd.
Manassas, Virginia 20110

       *Plaintiff,*

   v.

ARMANINO, LLP
12657 Alcosta Blvd., Suite 500
San Ramon, California

       *Defendant.*

Case No. _____

## COMPLAINT

Plaintiff American Type Culture Collection ("ATCC"), for its complaint against defendant Armanino LLP ("Armanino"), alleges the following:

### INTRODUCTION

1.    This action arises out of the fraud, professional negligence, and other misconduct of defendant Armanino, a California-based accounting and consulting firm, in misrepresenting its expertise, and the services it would provide, in order to obtain a lucrative contract to design and implement a new enterprise resource planning ("ERP") system at ATCC, a non-profit biological resource and public health organization, and then performing that contract deficiently, negligently, and fraudulently, and delivering an ERP system to ATCC that failed immediately upon implementation in September 2016, resulting in months of crippling outages, slowdowns, and performance failures that have caused and continue to cause enormous damage to ATCC.

2.    In 2015, ATCC, which is a national center in the United States for depositing and distributing biological specimens for research and public health purposes, decided that it needed

to replace its existing business management systems with a new and more modern ERP system, and have that new system certified as being compliant with current Good Manufacturing Process ("GMP") requirements. Because it did not have the knowledge or expertise to design or implement such a system itself, ATCC knew that it would have to rely on an ERP consulting firm to provide the necessary design and implementation expertise, resources, and training. As a result, it initiated discussions with a number of firms, including Armanino, about the possibility of retaining them to design and implement the new system at ATCC (the "Project').

3.      In the Spring of 2015, Armanino persuaded ATCC to retain it to provide these services by falsely representing that it had personnel with the required expertise and experience available to work on the Project, and could and would properly design, test, implement, and train ATCC personnel on the use of a Microsoft Dynamics AX-based ERP system that would satisfy ATCC's fundamental ERP needs on a timely basis, and would be certified as compliant with current GMP requirements. In fact, these representations, which included specific representations about the nature and quality of the services Armanino could and would provide, and the performance capabilities of the ERP system it would supply, were false and/or were made by Armanino with reckless disregard for their truth or falsity. At the time, Armanino knew these representations were false, as it had neither the ability nor the intention of staffing the Project with sufficiently qualified experts and software developers.

4.      After fraudulently inducing ATCC to enter into a professional services contract with Armanino to design, test, implement, and train ATCC personnel on the use of, an ERP system that would satisfy ATCC's fundamental ERP needs on a timely basis, would meet or exceed generally accepted industry standards for such systems, and would be certified as compliant with current GMP requirements, Armanino assigned consultants, designers, and

2

software developers to work on it who lacked the requisite skill and experience to create such a system and its host environment, and were unable to perform the contract with ATCC. The result was a severely deficient ERP system being implemented at ATCC.

5.      Among other problems, the hosting environment that Armanino designed and implemented to test and host the new Microsoft Dynamics AX-based ERP system, and store and protect ATCC's data, was fundamentally misdesigned, in that, among other problems, it had less than half the capacity required for such an environment (*i.e.* far too little server capacity), lacked proper firewall and anti-virus protections, and was not properly configured. The result was that when ATCC went live with the Armanino-designed system in September 2016, it repeatedly crashed and became unavailable, totally disrupting efforts to use the new ERP system.

6.      In addition to the fundamental undersizing and misdesign of the hosting environment, Armanino failed to follow industry standard implementation methodology in designing, testing, training people on, and then implementing, the new Microsoft Dynamics AX-based ERP system that was supposed to run in the hosting environment. Among other things, that methodology required adherence to generally accepted industry standards for careful documentation and control of software code development, changes, and customizations; comprehensive unit and system testing prior to Go-Live; thorough data cleaning, conversion and testing; and satisfaction of rigorous standards prior to Go-Live, and realistic training, performed with real data in a variety of business scenarios, prior to any Go-Live. Armanino was unable and failed to adhere to those standards.

7.      Armanino also was unable and failed to assign properly qualified and experienced software developers to work on the Project, and failed to properly supervise and direct the activities of the software developers it did assign, or to require proper documentation of their

3

code development – which it was obliged to do.  The result was consistently late delivery of inadequately tested and poor quality customized code, insufficient planning and organization of end to end user acceptance testing of code, and inadequate advice on when a transition to the new ERP system (the so-called "Go-Live") could safely be attempted.  Armanino also failed to properly convert and test ATCC data for use on the new system.

8.      Nevertheless, in late August of 2016, Armanino represented to ATCC that the core components of the new ERP system were "ready for go-live," *i.e.* to be put into operation at ATCC, and that other functions would be made available shortly after that Go-Live.  In fact, Armanino knew at the time, and had reason to know, that the services it had provided up to that point were seriously deficient, and that the system was not anywhere near being ready to put into operation at ATCC.  Nevertheless, it concealed these facts from ATCC, in order to extract additional payments from ATCC for work that was deficient, incomplete, or simply not performed, and to cover up its previous misrepresentations.

9.      The results for ATCC were disastrous.  Immediately after the September 2016 Go-Live, ATCC was unable to process the majority of its orders and shipments, virtually paralyzing its normal business functions.  From that point forward, Armanino engaged in a further pattern of misrepresentations, and fraudulent concealments of information, intended to obscure its deficient performance, and to try to improperly shift the blame for the Go-Live failure to ATCC.  By thus obscuring the true causes of the Go-Live failure, Armanino was able to extract substantial additional payment from ATCC to which it was not entitled.

10.     Over the next several months, however, ATCC retained independent experts from leading expert software consulting firms to examine the ERP system and hosting environment that Armanino had provided, and to analyze what had happened on the Project.  As a result of

4

their work, and also through the efforts of its own personnel, ATCC gradually learned the truth. Once it fully understood what had happened, ATCC terminated its contract with Armanino, began the process of trying to correct the deficiencies in the ERP system Armanino had supplied, and began assessing the damages it had suffered as a result of Armanino's aforesaid misconduct. This action is now brought to recover those damages, and for other relief as specified herein

## PARTIES

11.     Plaintiff ATCC is a private, non-profit 501(c)(3) corporation, organized under the laws of the District of Columbia, having its principal place of business at 10801 University Blvd., Manassas, Virginia 20110.

12.     ATCC is in the business of collecting, storing, and distributing standard reference microorganisms, cell lines and other biologic materials for medical and scientific research and development.  ATCC was established in 1925 to serve as a national center in the United States for depositing and distributing microbiological specimens, and has since grown in both size and scope to distribute its products and services in over 150 countries.  It is now among the largest general culture collections in the world, serving public health, academic, industrial and other public and private researchers all over the world.

13.     ATCC's principal place of business, and its headquarters and primary production facilities, are located in Manassas, Virginia.  ATCC offers an array of more 80,000 different biological specimen products to its customers, which are used both nationally and internationally by researchers in academia and government, as well as private industry.  Among other things, ATCC responds to public health emergencies that may arise such as dangerous influenza (or flu) virus outbreaks, or the Zika virus crisis.

14.     Unlike culture collections in many other countries, ATCC currently receives

5

essentially no funding or support from the government (other than through competitive contracts, noted below) or private sources. It has traditionally funded its non-profit mission and operations by maintaining advantageous economic and business relationships with its broad domestic and international customers in academia (universities and colleges), non-profit institutes, government and industry. Government contracts comprise about 30% of ATCC's total revenue, under which ATCC must deliver certain products and services in order to maintain and successfully re-compete for these highly competitive projects. Among the industries represented in ATCC's customer base are the pharmaceutical, biotechnology, agricultural and diagnostics industries, as well as food, beverage and cosmetics makers and reference and testing laboratories.

15.     ATCC has also traditionally maintained advantageous economic and business relationships with its authorized distributors, who are located in Europe, Japan, Australia, New Zealand, Hong Kong, Singapore, South Korea, Israel, and Taiwan. Approximately 25% of ATCC customers are located outside the U.S. Many customers purchase ATCC products from one of more of ATCC's authorized distributors.

16.     Defendant Armanino is a large accounting and professional services firm based in California. It has a principal place of business at 12657 Alcosta Blvd., Suite 500, San Ramon, California, and other offices in California, Texas, and Illinois. Armanino maintains a website on the internet, which is accessible by the general public, at www.armaninollp.com, and markets itself as an accounting and professional services firm offering and providing business management and technology solutions to companies in the U.S. and globally.

17.     Armanino provides and offers to provide its clients with a variety of professional services, including the design, assembly, customization, and implementation of enterprise resource planning, or "ERP," systems, and their host environments. Armanino represents to the

6

public that it has unique skills, expertise and knowledge in the area of designing, assembling, customizing, and implementing ERP systems and their host environments, including cloud based ERP systems and their cloud-based host environments.

## JURISDICTION AND VENUE

18.    This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are diverse in citizenship.

19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this judicial district and division.

20.    This Court has personal jurisdiction over defendant Armanino under Va. Code Ann. §8.01-328.1 because the causes of action asserted herein arise from Armanino transacting business in the Commonwealth of Virginia, contracting to supply services or things in this Commonwealth, causing tortious injury by acts or omissions in this Commonwealth, and causing tortious injury in this Commonwealth by acts or omissions outside this Commonwealth.

## FACTUAL ALLEGATIONS

### *Enterprise Resource Planning ("ERP") Systems*

21.    The term "enterprise resource planning," or "ERP," generally refers to the automated control, management and planning of an organization's core business processes (such as purchasing materials, accepting and fulfilling customer orders, managing inventory, shipping and tracking products, maintaining and updating customer information, scheduling business activities, generating financial reports, etc.) through the use of an integrated computer processing and data storage and retrieval system consisting of individual workstations, graphical user

7

interfaces, application software, hardware, database storage and management tools, and electronic communications networks, all connected to and/or maintained in a secure hosting environment.

22.     The term "ERP system" refers to a specific group of workstations, graphical user interfaces, application software programs, hardware, database storage and management tools, and secure electronic communications networks, all connected to and/or maintained in a secure hosting environment, which are designed, assembled, configured, and customized so as to function together, in real time, to enable a specific business organization to effectively perform its basic ERP functions in a timely and continuous manner, and with sufficient capacity. Often such systems are based on the use of specific core application software packages designed for use in such systems.

23.     The term "ERP implementation" refers to the selection, design, sizing, configuration, set-up, installation, testing, formatting and migration of existing data and systems to, training of personnel on the use of, actual transition to (so-called "Go Live"), and post Go-Live maintenance and troubleshooting of, a set of workstations, graphical user interfaces, application software, hardware, database storage facilities and database management tools, electronic communications networks, and the hosting environments in which they operate, comprising specific ERP systems. A number of professional services firms, both in the U.S. and abroad, offer specialized ERP implementation services to clients, and hold themselves out as having specialized knowledge, expertise and professional experience in ERP implementation.

### *Armanino's Pre-Contract Misrepresentations to ATCC*

24.     In early 2015, ATCC decided that it needed to replace its existing business management systems with a new and more modern ERP system, and in the process have that

8

new system certified as being compliant with current Good Manufacturing Process ("GMP") requirements.  In light of the significant operational risks inherent in such a transition, and the fact that it did not have the knowledge or expertise to design or implement such a system itself, ATCC knew that it would have to rely on an ERP consulting firm to provide the necessary design and implementation expertise, resources, and training.  As a result, it initiated discussions with a number of firms, including Armanino, about the possibility of retaining them to design and implement the new system at ATCC (the "Project').

25.    At that time, in early 2015, Armanino was representing itself to the general public as having unique professional skill, expertise, knowledge, and experience in ERP implementation involving Microsoft's Dynamics AX technology, and particularly in the selection, design, sizing, configuration, set-up, installation, testing, formatting and migration of existing data and systems to, training of personnel on the use of, actual transition to (so-called "Go Live"), and post Go-Live maintenance and troubleshooting of, ERP systems based on Microsoft's Dynamics AX technology.  Armanino reiterated those representations about its expertise in this area to ATCC in early 2015 during its discussions with ATCC about ATCC's interest in transferring its ERP functions to such a system.

26.    In letters to Ralph Koch of ATCC dated March 30, April 16, and May 12, 2015, labeled as **"Budgetary Summary"** and **"Dynamics AX 2012 R3 Budgetary Proposals"** (the "Budgetary Proposals"), John J. Burke of Armanino represented to ATCC, *inter alia*, that Armanino specialized in providing its professional services to businesses "that want to deploy the Microsoft Dynamics AX Software Solutions" in their ERP systems; that "based on ATCC's ERP system requirements, Armanino had already identified "a select group of ISV solutions" that would "provide the complete business solution set" that ATCC required; and that Armanino

9

had already created a hosting "infrastructure design" for the new ERP system that would "support up to 500 users for a service-oriented company," and was configured with three environments, "Development, Test and Production." These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were known by Armanino to be false or misleading, and/or were made by Armanino with reckless disregard for their truth or falsity.

27.     Armanino further represented, in the Budgetary Proposals that it delivered to ATCC, that it had, and would be able to assign to the Project, all the resources and expert personnel necessary to "leverage industry best practices" to provide ATCC with "a single integrated business system" that would "automate business processes across multiple departments and multiple sites," provide ATCC with "timely operational and financial reporting," and provide ATCC with "the ability to access real-time sales, purchasing, financial, supplier, and customer data to make better informed business decisions." These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were also knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

28.     Armanino further represented, in the May 12, 2015 "Budgetary Proposal" that it delivered to ATCC, that the amounts it intended to charge and would charge for the services that would be needed to implement the new ERP system at ATCC would be $2.1 Million, billed over the course of the following year.  Armanino knew at the time, however, that this representation was false in that the costs were significantly understated, and/or made the representation with reckless disregard for its truth or falsity, in order to induce ATCC to enter into a long-term professional services contract with it.

29.     In still other proposals presented to ATCC by Armanino prior to any contract being executed by the parties, Armanino represented, *inter alia*, that if ATCC entered into a

professional services contract with Armanino for the Project, Armanino would provide the following professional services to ATCC "in a professional and workmanlike manner conforming to generally accepted industry standards," using "industry best practices," maintaining current "GMP (Good Manufacturing Practice) standards," and "comply[ing] with GMP regulations," within the timeframe described in the proposals:

      a.    build a hosting environment in Microsoft's Azure Cloud that would be adequate to enable the Dynamics AX-based ERP system that it would also provide to satisfy those needs;

      b.    determine how ATCC's specific ERP requirements could best be satisfied, or modified so that they could be satisfied, using a Dynamics AX-based ERP system in combination with customized "add-on" software that Armanino would supply;

      c.    properly document and test the new ERP system to ensure it would satisfy Good Manufacturing Process ("GMP") certification requirements, and function properly in actual full-scale operation at ATCC;

      d.    properly train ATCC personnel in how to operate the new system;

      e.    supervise and direct the successful "Go-Live" implementation of the new system; and

      f.    provide follow-on maintenance and monitoring services with respect to the new system.

These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

30.     Specifically, Armanino represented to ATCC in May of 2015, in a written proposal entitled **"Statement of Work for Dynamics Hosting Services ATCC – Revised May 14, 2015"** that Armanino partner Bruce Kirschenbaum sent to ATCC at that time (the "Hosting Proposal"), that if ATCC entered into a professional services contract for the Project with Armanino, Armanino would, in the timeframe described in that proposal, "in a professional and workmanlike manner conforming to generally accepted industry standards," as represented on page 4 of a contemporaneous letter, dated May 27, 2015, sent by Armanino partner Bruce Kirschenbaum to ATCC CFO Ralph Koch at the time (the "May 27 Letter"), using "leading IT management tools," Hosting Proposal at p. 7, maintaining current "GMP (Good Manufacturing Practice) standards," and "comply[ing] with GMP regulations," *id.* at p. 8, and complying with and maintaining current GMP (Good Manufacturing Practice) standards in a manner that could be certified as such by Armanino's subcontractor Onshore, *id.* at p. 4, design, build, and install at ATCC a secure cloud-based electronic infrastructure hosting environment enabling the new Dynamics AX-based ERP system that Armanino would also be providing to ATCC to run reliably, and at full capacity, "at least 99.9% of the time on twenty-four (24) hours per day, seven (7) days per week basis, measured monthly." *Id.* at p. 15. These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

31.     Armanino further represented to ATCC, in its Hosting Proposal to ATCC, that if ATCC entered into a professional services contract with Armanino for the MAX Project, Armanino would, in the timeframe described in that proposal, "in a professional and workmanlike manner conforming to generally accepted industry standards," as represented in the May 27 Letter at p. 4, and using "leading IT management tools," Hosting Proposal at 7,

maintaining current "GMP (Good Manufacturing Practice) standards" and "comply[ing] with GMP regulations," *id.* at p. 8,

    a. "provide[] Dynamics AX Hosting and Managed Services...includ[ing] pre-production hosting environment, database management, operating system and network management services...," *id.* at 2ⁿᵈ page (May 12, 2015 letter),

    b. "provide a totally integrated solution," May 12 SOW at 5;

    c. provide "24X7 - Constant coverage, 24 hours per day, 365 days per year" for "[a]ll infrastructure" delivered under its proposal, *id.* at 5;

    d. provide to ATCC "[v]irtual and/or physical servers that meet the customer's [ATCC's] requirements" and "servers protected with the latest technology," *id.* at 5;

    e. provide "[f]irewall administration" "[c]onnectivity" between ATCC and its datacenter "through internet or VPN," *id.* at 6 (emphasis added), and "Operating system patches management," "Security management services," "Capacity planning," "SQL Server software patching," and

    f. take "extreme care" to make sure that ATCC's data was secure." *Id.*

Armanino further represented, in the Hosting Proposal, that if ATCC agreed to enter into a professional services contract with Armanino for the MAX Project, "[f]rom the point of execution of" that contract and acceptance of the Hosting Proposal, "the system infrastructure and installation of the AX software programs will be completed within ten (10) business days by Armanino Systems Engineers." *Id.* at p. 17. These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

    32.    Armanino further represented to ATCC in May of 2015, in a written proposal entitled "**Statement of Work for Dynamics Services ATCC – Revised May 14, 2015**" that Armanino partner Bruce Kirschenbaum sent to ATCC at that time (the "Dynamics Proposal"), that if ATCC entered into a professional services contract with Armanino for the MAX Project, Armanino would, in the timeframe described in the proposal, and "in a professional and

workmanlike manner conforming to generally accepted industry standards," as represented in the May 27 Letter at p. 4, and using "industry best practices," Dynamics Proposal at p. 4, and complying with and maintaining current GMP (Good Manufacturing Practice) standards in a manner that could be certified as such by Armanino's subcontractor Onshore, *id.* at p. 8, assume and fulfill "Lead Responsibility" for – which Armanino represented meant that it "would be responsible and accountable for end-to-end delivery, providing templates, leading content development, and completing Deliverables in a timely manner for," *id.* at p. 14 – the entire design, configuration, and set up of the hosting environment for the new Microsoft Dynamics AX–based ERP system at ATCC, including

- Hardware Scoping and Sizing
- Obtaining the Hardware Hosting Agreement
- Obtaining the necessary Software and Licenses Procurement
- Coordinating the Setup of the Environment
- Maintenance and Admin. of environment hardware
- Maintenance and Admin. of environment for configuration (e.g., Application Monitoring, Security Management, Correction and Transport System, Batch Job Scheduling, Performance and Capacity management, Client Refreshes, MS-SQL Database and Windows OS administration, Print Management, OSS)
- Module installations and environment builds of current versions of In Scope Armanino ATCC Software
- Instance and code promotion controls.

These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were also knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

33.    Armanino also represented, in its Dynamics Proposal to ATCC, that if ATCC entered into a professional services contract with Armanino for the MAX Project, Armanino would, in the timeframe described in that proposal, "in a professional and workmanlike manner conforming to generally accepted industry standards," as represented in the May 27 Letter at p.

14

4, and using "industry best practices," *see* Dynamics Proposal at p. 4, and complying with and maintaining current GMP (Good Manufacturing Practice) standards in a manner that could be certified as such by Armanino's subcontractor Onshore, *id*. at p. 8, assume and fulfill "Lead Responsibility" for – which Armanino represented meant that it "would be responsible and accountable for end-to-end delivery, providing templates, leading content development, and completing Deliverables in a timely manner for," *id*. at p. 14 – designing, configuring, testing, training ATCC personnel on, deploying, and then maintaining a fully functional MAX-based ERP system tailored to meet ATCC's specific ERP system requirements.  These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

34.     Specifically, Armanino represented, in the Dynamics Proposal, that if ATCC entered into a professional services contract with Armanino for the MAX Project, Armanino would, in the timeframe described in the proposals, and "in a professional and workmanlike manner conforming to generally accepted industry standards," as represented in the May 27 Letter at p. 4, and using "industry best practices," Dynamics Proposal at p. 4, and complying with and maintaining current GMP (Good Manufacturing Practice) standards in a manner that could be certified as such by Armanino's subcontractor Onshore, *id*. at p. 8, assume and fulfill "Lead Responsibility" – defined by Armanino to mean that it "would be responsible and accountable for end-to-end delivery, providing templates, leading content development, and completing Deliverables in a timely manner for," *id*. at p. 14 – to "deliver[] strategic value and process integration and standardization" in the new Microsoft Dynamics AX-based ERP system that it would deliver to ATCC, *id*. at 4, employ "a proven, comprehensive approach used on all projects," "enable a successful solution deployment" of that system at ATCC, *id*. at p. 13, and

15

complete "the functional and technical development required in the functional design, technical design, development, unit testing, and test plan creation elements" that would be required "for each integration element" of the new Microsoft Dynamics AX-based ERP system that it would deliver to ATCC.    These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were also knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

35.    Armanino further represented, in its Dynamics Proposal, that if ATCC entered into a professional services contract with Armanino for the MAX Project, Armanino would, in the timeframe described in the proposals, and "in a professional and workmanlike manner conforming to generally accepted industry standards," as represented in the May 27 Letter at p. 4, and using "industry best practices," Dynamics Proposal at p. 4, and complying with and maintaining current GMP (Good Manufacturing Practice) standards in a manner that could be certified as such by Armanino's subcontractor Onshore, *id.* at p. 8, assume and fulfill "Lead Responsibility" for – defined by Armanino to mean that it "would be responsible and accountable for end-to-end delivery, providing templates, leading content development, and completing Deliverables in a timely manner for," *id.* at p. 14 – the following professional services in connection with the design, assembling, customization and implementation of the new Dynamics AX-based ERP system at ATCC:

first, in the area of planning and analysis:

- finalizing system architecture (preproduction and production) required for the AX footprint in a hosted environment,
- managing the System Administration/Database/Environment,
- installing application software for the pre-production environments (i.e., training, test, development),
- developing high-level enterprise architecture design document,
- updating RDA Gap/Fit and AX High-Level Design,

16

#53981242_v6

- completing Fit/gap and fig/gap disposition,
- estimating of gaps for RICEFW objects (for gaps requiring custom development) as part of High-level Design Document, and
- developing appropriate installation documents along with the installed software for the installed environments

*id.* at 13-14; and completing and providing the following Deliverables to ATCC "in a timely manner":

- A Fit-Gap Analysis detailing the business requirements that were and are not supported by out-of-the-box software functionality (standard configuration) of MAX, identifying the software and functionality proposed to satisfy the functional requirements and how the requirement will be met for requirements that 'Fit', and analyzing any gaps where the business requirements cannot be met by the In Scope Software and documenting gap disposition including reporting analytics and dashboards, manual workarounds, or additional software requirements; and

- An Infrastructure Design Document depicting the infrastructure sizing, related tools, hardware requirements, and configurations of the infrastructure required to support the application portfolio, supporting architecture, and environment strategy (e.g., for each environment required per the environment and instance strategy);

*id.* at 14-15; <u>second</u>, in the area of the Design and Configuration,

- Scheduling and facilitating data mapping/conversion workshops to update existing mapping based on design changes and define approach and best practices to data extraction, cleansing, conversion, and load activities;
- Scheduling and facilitating business modeling for training and knowledge transfer workshops to reconcile business requirements to Dynamics AX processes;
- Scheduling and facilitating business system integration workshops to identify key process and design interdependencies and resolve design conflicts;
- Performing fit-gap updates and impact analysis to identify development needs
- Developing and maintaining the Enterprise Design Documents (including functional and technical specifications) based on the Business Requirements
- Performing configuration of the In Scope System
- Developing object technical specifications and code per the Enterprise Design Documents leveraging necessary development tools
- For Development items: Tracking, consolidating, and reporting the execution status of each unit test case
- For Development tracking: Maintaining traceability of test cases to Business Requirements;
- Documenting all identified Defects and modifying configurations and code as necessary to fix Defects
- Developing materials for and facilitating Quality reviews.

*id.* at 18-19; and completing and providing the following Deliverables to ATCC "in a timely manner":

- the Test Strategy describing the elements of testing that are in scope and the key deliverables required to support testing, providing a high-level overview of what will be tested, how the tests will be conducted, who will perform the testing, the timing of each type of test, and how defects will be managed. This document defines the methods and tools and how they will be used to confirm that the system is functioning as designed at each testing phase. Addresses testing requirements for Unit Testing, String Testing, Integration Testing, User Acceptance Testing, and Performance Testing.
- the Enterprise Design Document detailing the business requirements, desired functionality, functional specifications, technical specifications, and the test requirements, test plan, test scenarios, and test script for each RICEFW development object Reports, Interfaces, Conversions, Enhancements, Forms, and Workflows (not standard configuration).
- the Data Conversion and Design Plan including the Plan for cleaning the legacy data, the Load plan for migrating data in the right sequence (Timing of the data being migrated) Converted/Migrated Data Validation, Mock Cutover test plan, Final Data Migration for Go-Live plan
- the Updated Requirements Traceability Matrix
- the Test Plan Template and Test Case Library
- the EDD Test Plan and Tech Cases;

*id.* at 19-22; <u>third</u>, in the area of Testing,

- Converting data as required for string testing (mock conversion 1) and integration testing (mock conversion 2) using real ATCC data
- Processing string testing events against converted data (e.g., process cash receipts against converted open accounts receivable transaction, process new purchase order using converted suppliers) to ensure all requisite data has been converted and reconciled to the source system and data integrity has not been compromised during the conversion process
- Configuring security and control components by, inter alia, designing roles and standard security profiles through the AX pre-set security protocols, and providing training for security and compliance resources;
- Developing training material prototypes for ATCC super users, testers, and trainers used in integration test preparation
- Confirming and documenting the full traceability of integrated test scenarios to Business Requirements;
- Testing the integrations and data interfaces in the TEST database including peripheral internal and external systems (listed in the Integration Scope Table) and batch scheduling using production representative transactions

- Tracking, consolidating, and reporting the execution status of each integration test cycle
- Documenting, tracking, consolidating, resolving, and reporting status of all identified Defects
- Documenting all identified Defects and modifying configurations and code as necessary to fix Defects
- Completing training of ATCC super users
- Managing and tracking end-user training to be completed by ATCC
- Providing end-user training
- Completing mock conversion and mock cutover
- Developing materials for and facilitate Quality reviews
- Conducting regression testing to resolve Defects as necessary to meet the Acceptance Criteria for each test cycle

*id.* at 22-23; and *inter alia,*

- Designing, configuring and planning Unit testing of ERP system components, specifically self-contained component level testing of configurations and development
- Designing, configuring and planning String testing of ERP system components, specifically testing ability of ERP system to handle multiple transactions in logical sequence, tied to end to end processes and functions
- Designing, configuring, planning and implementing System Testing of the ERP system host environment, specifically technical production system readiness testing;
- Designing, configuring, planning and implementing Performance Testing of the ERP system host environment, specifically load stress testing for the system at expected (and greater) user levels and volume; and
- Designing, configuring and planning Security access testing including negative testing of all ERP system components.

*id.* at 30-31; and completing and providing the following Deliverables to ATCC "in a timely manner":

- CRPIII Test Scripts aligned with project scope;
- End User Training to ATCC personnel, reinforcing the training received previously, the train-the-trainer approach next step is the trained client super users teach the other non-core project team member end users. Also includes basic workflow processing training for Enterprise Portal corporate users.
- The Mock Data Conversion Completion, consisting of preparation for actual production data conversion Mock Data process by first completing a test data conversion to Conversion create the CRP Ill test environment, loading actual client master and transaction data available through the last period close date.
- The Draft Go-Live Plan -- defining the detailed steps required to convert from a legacy systems to a production system, and documenting the required activities, any

19

dependencies, the persons responsible for the Go-Live activities, and an hourly schedule for the activities.

*id.* at 23-24; <u>fourth</u>. in the area of training,

- Developing training strategy and plan
- Ensuring that key stakeholders and project team members are educated in the methodology and Project approach
- Developing and delivering 'train the trainer' program
- Scheduling (ATCC & Armanino) and delivering end user training
- Scheduling and conducting application support knowledge transfer;

*id.* at 29; <u>fifth</u>, in the area of Deployment/Go Live, *inter alia*,

- Finalizing a detailed Go-Live plan and deployment and implementation strategy
- Refining and executing a Go-Live Checklist
- Executing the Go-Live plan after written approval received that all exceptions, issues, and applicable Defects resulting from the Operational Readiness Review and Production Readiness Review have been effectively remediated
- Completing the Go-Live of all In Scope Production System components, migration and conversion of all in-scope data, Processes and Functions as enabled by the In Scope Production System
- Updating prior Deliverables, as required, if and to the extent go-live impacts their content
- Executing the transition support plan and launch the support organization
- Developing materials for and facilitate Quality reviews

*id.* at 25; and completing and providing the following Deliverables to ATCC "in a timely manner":

- Detailed day-by-day Go-Live checklist for the final data conversion and go-live process.
- Release Go/No-Go Criteria -- a list of criteria and Release Go/No-Go best practices to identify if the system is ready for production and that the organization is ready to accept and operate the new system.
- Production Data Conversion -- Lead execution of the final data conversion process to populate the production environment for go-live taking into account that Data loading is typically a combination of manual data (by client for low volume data types) and automated data imports.
- Production System -- Operational In Scope Software production environment available to ATCC end users conforming to ATCC business requirements;

*id.* at 25-26; <u>sixth</u>, in the area of Post Go-Live / Support, *inter alia*,

- Providing production support

- Escalating and triaging production issues to the appropriate support teams
- Providing production support metric reporting representing the status of production support including open tickets and prioritized issues (JIRA Tracking System)
- Addressing performance issues and conduct performance tuning and optimization
- Continuing to resolve Defects in Development Objects and/or configuration both known before the move to production and identified after the move to production
- Supporting ATCC through the close of the first two month end close periods, and the first quarter end.
- Conducting regression testing to resolve Defects as necessary to meet the Acceptance Criteria for each test cycle
- Developing materials for and facilitate Quality reviews
- Creating documentation for GMP compliance

*id.* at 27; and completing and providing the following Deliverables to ATCC "in a timely manner":

- Q&A and general support for ATCC's execution of the first period close;
- Q&A and general support for ATCC's execution of the second period close;
- Q&A and general support for ATCC's execution of the third period close; and
- Handoff of final deliverables, documentation and checklist of the project artifacts;

*id.* at 27; <u>seventh</u>, in the area of overall project management:

- Managing program achievement, issues, and risks
- Tracking, reviewing, analyzing, and reporting (historical and predictive) on, all issues and risks related to the services through Project tools
- Triggering and managing program issues escalation
- Monitoring and reporting on Project and Services performance
- Providing Project status
- Executing and tracking against knowledge transfer plan progress (through status reports)
- Establishing and maintaining Project communications
- Providing documentation and procedural standards for Deliverables
- Preparing and maintaining the project plan, and ensuring that the project plan is accurate and updated on a weekly basis
- Ensuring the project plan contains competing initiatives and inter-dependencies
- Reviewing project plan tasks, schedules, and staffing and recommending direction, additions, or changes, as appropriate
- Working with the ATCC Project Manager and Project Management Office ("PMO") to address and resolve deviations from the project plan
- Conducting regularly scheduled status meetings
- Preparing and submitting status reports to ATCC
- Administering and tracking the change control log and status with ATCC

- Maintaining the applicable program management Deliverables from the Initial Statement of Work
- Developing materials for and facilitating Quality reviews;

and delivering "a detailed project plan, quality reviews, issue log and weekly status reports to ensure steady and efficient progress, cost control and avoidance of any unexpected 'surprises'," and would include "solution architect, systems engineering and corporate communications support activities." These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

36. Armanino further represented, in its Dynamics Proposal to ATCC, that if ATCC entered into a professional services contract with Armanino for the MAX Project, Armanino would, in the timeframe described in that proposal, and "in a professional and workmanlike manner conforming to generally accepted industry standards," as represented in the May 27 Letter at p. 4, and using "industry best practices," Dynamics Proposal at p. 4, and complying with and maintaining current GMP (Good Manufacturing Practice) standards in a manner that could be certified as such by Armanino's subcontractor Onshore, *id.* at p. 8:

a. "provide the methodology, tools and guidance for data conversion" of ATCC's business data into a form suitable for use with the new Microsoft AX ERP system to which ATCC would be transitioning;

b. "be responsible for the creation of conversion programs to populate the extracted data into Dynamics AX,"

c. "conduct data conversion/migration workshops to identify detailed data conversion requirements, scope and approach, conversion testing requirements and approach, and defined the data conversion strategy document."

d. "[d]efine data conversion strategies and approach/tools" for use in converting ATCC's business data into a form suitable for use with the new Microsoft AX ERP system to which ATCC would be transitioning;

#53981242_v6

e. "[d]efine data cleansing strategy and plan" for converting ATCC's business data into a form suitable for use with the new Microsoft AX ERP system to which ATCC would be transitioning;

f. "[p]rovide conversion templates to inform required data structures" for converting ATCC's business data into a form suitable for use with the new Microsoft AX ERP system to which ATCC would be transitioning;

g. "[d]evelop data mapping and conversion templates" for converting ATCC's business data into a form suitable for use with the new Microsoft AX ERP system to which ATCC would be transitioning;

h. "[d]efine and develop transformation routines" for converting ATCC's business data into a form suitable for use with the new Microsoft AX ERP system to which ATCC would be transitioning;

i. "[p]erform data conversion" of ATCC's business data into a form suitable for use with the new Microsoft AX ERP system to which ATCC would be transitioning;

j. "[p]rovide reports to assist ATCC in the validation and reconciliation of data including outlining conversion error rates" in connection with converting ATCC's business data into a form suitable for use with the new Microsoft AX ERP system to which ATCC would be transitioning; and

k. "[r]esolve data conversion issues identified after go-live, including updating conversion scripts as required to reconvert data converted with issues or errors

*Id.* at pp. 32-33. These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

37. Armanino further represented, in its Dynamics Proposal to ATCC, that if ATCC entered into a professional services contract with Armanino for the Project, Armanino would, in the timeframe described in the proposals, and "in a professional and workmanlike manner conforming to generally accepted industry standards," as represented in the May 27 Letter at p. 4, and using "industry best practices," Dynamics Proposal at p. 4, and complying with and maintaining current GMP (Good Manufacturing Practice) standards in a manner that could be certified as such by Armanino's subcontractor Onshore *id.* at p. 8,

23

a. "assign a quality assurance management resource ("Quality Control Officer") that shall review and provide oversight of the quality of program services to ATCC … to ensure that each facet of the Project is thorough, each task is accomplished to the highest degree of accuracy and superior performance";

b. That "[s]uch oversight shall be part of Armanino's delivery model for all phases of the program," *id.* at p. 34; and that

c. "[t]wo to three weeks prior to the completion of each Phase Milestone, the Quality Control Officer will review the work performed by each project team member and provide a written report of performance findings and recommended changes, actions, and improvements (a "Quality Check Audit Report")" which "will be presented to the ATCC PMO and Steering Committee." *Id.* at pp. 34-35.

These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

38.    Armanino further represented, in its Dynamics Proposal to ATCC, that if ATCC entered into a professional services contract with Armanino for the Project, Armanino would, in the timeframe described in the proposals, and "in a professional and workmanlike manner conforming to generally accepted industry standards," as represented in the May 27 Letter at p. 4, and using "industry best practices," *see* Dynamics Proposal at p. 4, employ and assign personnel to work on the Project meeting the following "Skillset Requirements":

Engagement Partner Skillset Requirements

• BS/BA degree preferably in a technical discipline, or equivalent training, education
• PMP (Project Management Professional) Certification or equivalent preferred
• 11 - 15 years of project management, program management or IT Management, including financial and schedule performance reporting
• Minimum 8 years of experience managing cross-functional and end-to-end IT business processes
• Experience in all phases of systems development from concept through installation and maintenance, a minimum of 5 years of experience in required technology
• Expertise in the Life Science industry on transformational business process
• Master level proficiency in automated project management tools such as Microsoft Project; and

24

• Master level proficiency in analytical, organizational, project management, interpersonal and communication skills (verbal and written).

Project Manager Skillset Requirements

• BS/BA degree preferably in a technical discipline, or equivalent training, education
• PMP (Project Management Professional) Certification or equivalent preferred
• 8 - 10 years of project management, program management or IT Management, including financial and schedule performance reporting
• Minimum 5 years of experience managing cross-functional and end-to-end IT business processes
• Experience in all phases of systems development from concept through installation and maintenance, a minimum of 5 years of experience in required technology
• Master level proficiency in automated project management tools such as Microsoft Project
• Advanced proficiency in analytical, organizational, project management, interpersonal and communication skills (verbal and written).

Functional Consultant Skillset Requirements

• BA/BS in functional field
• 7 to 10 years diverse experience in business process analysis, design, and transformation in the relevant process area
• Experience in all phases of business process transformation projects, a minimum of 3 projects completed in Dynamics AX
• Expertise in the Life Science industry on transformational business process.

Developer Skillset Requirements

• BA/BS in Computer Science or related field, or an equivalent combination of education and/or experience;
• 5 years of experience developing code and managing projects in the required technology;
• Expert knowledge of .NET, *CIC++ IC#,* Java, and other similar Object-Oriented Programming, Microsoft suite of tools, Dynamics AX and *I* or other package software applications;
• Expert knowledge of databases (including tools and utilities);
• Proficiency with Dynamics AX, business process and underlying programs and tables
• Problem-solving skills and proven record of working well in a team environment; and
• Advanced proficiency in analysis, leadership, and communication skills (verbal and written)/across all organizational levels.

Systems Engineer

• BA/BS in Computer Science, Engineering, or an equivalent combination of education and/or experience;

•5 years of work experience as a system engineer;
• Minimum 3 years of experience in software development and/or project management;
• Expert level knowledge of standard Systems Integration tools and practices;
• Advanced technical proficiency in using a wide range of software applications and products;
• Demonstrated ability in the fields of computer networking, enterprise application integration, and business process management;
• Advanced Knowledge of internets, intranet, and extra net systems design, database design, and network architecture.

*See* Dynamics Proposal at Attachment A.  These representations, which were intended to induce ATCC to retain Armanino to perform the Project, were knowingly false and/or were made by Armanino with reckless disregard for their truth or falsity.

39.     The specific misrepresentations by Armanino to ATCC set forth in paragraphs 3, 8-9, and 25-38 hereof, and others made by Armanino to ATCC at the time, were intended by Armanino to be relied on by ATCC in deciding whether to enter into a professional services contract with Armanino in connection with the MAX Project, and were in fact reasonably relied on by ATCC in deciding whether to enter into such a contract with Armanino.

40.     The specific misrepresentations by Armanino to ATCC set forth in paragraphs 3, 8-9, and 25-38 hereof, and others made by Armanino to ATCC at the time, were intended by Armanino to induce ATCC to enter into a professional services contract with Armanino in connection with the Project, and did in fact induce ATCC to into a Professional Services Contract with Armanino (the "Professional Services Contract" or "Contract") on or about May 28, 2015.

### *Armanino's Professional Services Contract with ATCC*

41.     The Contract was entitled "Master Services Agreement," and was signed by ATCC on or about May 28, 2015, and by Armanino on or about June 1, 2015.  It provided, *inter*

*alia*, that "[t[his agreement shall be governed by and construed and enforced in accordance with the laws of the State of California."

42.     Armanino agreed in the Contract, and the Contract required Armanino to provide to ATCC, *inter alia*, the professional services and deliverables necessary to implement a new Dynamics AX-based ERP system at ATCC that would fulfill all of its ERP requirements, to train ATCC personnel in the use of that system, and thereafter to maintain that system.

### Armanino's Common Law Duty of Care to ATCC

43.     Under the applicable California law, Armanino owed ATCC a duty to exercise reasonable due care and skill in performing the professional services it had agreed to provide in the Professional Services Contract, and to perform that Contract with the reasonable care, skill and knowledge of competent professionals in that field.

44.     Armanino knew in May of 2015, when it agreed to provide the professional services described in the Contract, that if it failed to perform that Contract with the reasonable care, skill and knowledge of competent professionals in that field, or failed to exercise reasonable due care and skill in performing the professional services it had agreed to provide in the Contract, ATCC would suffer substantial and in some cases irreparable harm and damages, including severe damage to its relationships with its customers and distributors.

### Armanino's Post-Contract Fraudulent Misrepresentations, Fraudulent Concealments, and Deficient Work

45.     Armanino began its work on the Project in June of 2015.  In the months that followed, ATCC became concerned, and expressed those concerns to Armanino, about what appeared to be a lack of sufficient skilled resources and management time being devoted to the Project by Armanino, about the poor quality of software code being produced by Armanino developers, and about significant slippages by Armanino in the schedule for completion of key

Project milestones that it had provided to ATCC, and committed to follow, at the outset of the Project. Armanino's Engineering Design Development ("EDD") specifications for key pieces of software were repeatedly delivered late, for example, and appeared to be of poor quality, and the related software code was often not delivered to ATCC in time for the scheduled testing.

46.     ATCC's concerns about these issues heightened in 2016 when the hosting environment for the new ERP system, and various custom software packages developed by Armanino, failed to perform as required in testing, and when Armanino's GMP certification subcontractor revealed to ATCC that it could not certify Armanino's ERP system as being GMP compliant due to the instability of the software code that Armanino was delivering, and the lack of proper documentation of the changes in that software. ATCC also became concerned in 2016 when Armanino first resisted providing training services to ATCC personnel on the use of the new system, and the new Microsoft Dynamics AX software running on it, and then grudgingly provided only mediocre training which left ATCC personnel concerned about whether they would be able to use the new system effectively.

47.     In response to these and other concerns expressed by ATCC, which by then had paid substantial fees to Armanino and was committed to working with it on the Project, Armanino repeatedly reassured ATCC that the Project was proceeding normally, with no major problems, and that it had well-qualified and experienced experts working on the Project who would ensure that the new ERP system could be implemented at ATCC in full within a few months of the previously scheduled implementation date. Armanino knew at the time it made these representations, however, that the representations were false, and/or made them to ATCC with reckless disregard for their truth or falsity. in order to extract more money from ATCC, and avoid having its Contract with ATCC terminated.

48.     When ATCC expressed concern about Armanino's failure to deliver EDD's and important software code by previously committed milestone dates, for example, Armanino dismissed those concerns and represented that it would make the missed deliveries by the next milestone date, though it often could not and did not.  Then, when needed code was finally delivered, and still did not perform properly in testing, Armanino repeatedly represented that it could and would make it work in a timely fashion, when in fact it could not and later did not because it was incomplete and required extensive rework.  Again, Armanino knew, at the time they were made, that these representations were false, and/or made them to ATCC with reckless disregard for their truth or falsity, in order to extract more money from ATCC, and avoid having its Contract with ATCC terminated.

49.     While Armanino was making the aforesaid misrepresentations, Armanimo also fraudulently concealed both the deficiencies in the ERP system and hosting environment it was providing, and the fact that it did not have, and had not retained or assigned to work on the Project, personnel with the necessary expertise and experience in developing the required software code, in managing a Project of this complexity, or in designing and implementing the new ERP system, and the new hosting environment for it, that ATCC required.

50.     When ATCC's Director of Shared Services expressed concern that an Armanino employee with the title of "systems engineer" was insisting that the new ERP system was "not reliable" to print to ATCC's Network printers, for example, and instead had to be connected directly to ATCC local printers – which was neither secure nor supportable, was not consistent with industry best practices, and was, in the ATCC official's expressed opinion (after being repeatedly pressured by the Armanino systems engineer to agree to it) a "stupid" idea – Armanino, instead of admitting that fact, attacked the ATCC official as being "hostile" in order

to divert attention from the real problem, which was serious deficiencies in the competence of its own personnel, and in the ERP system and hosting environment it had designed. Armanino fraudulently concealed those deficiencies from ATCC even though it had a clear duty to disclose them to ATCC, in order to extract more money from ATCC, and avoid having its Contract with ATCC terminated.

51.     Finally, in September of 2016, more than a year after commencing its work on the Project, and having been paid over $5 Million for its services, Armanino recommended that ATCC proceed to "Go-Live" with – *i.e.* to begin to transfer its essential ERP functions over to – the new Microsoft Dynamics AX-based ERP system that Armanino had designed, tested, and trained ATCC's personnel on over the previous year (the "System"). Armanino knew when it made that recommendation that ATCC should **not** proceed to attempt to go live, and that it was very risky for ATCC to attempt to do so, but Armanino concealed that knowledge because to reveal it would have exposed massive deficiencies in its work up to that point, and jeopardized its ability to collect more money from ATCC for that work.

52.     Specifically, on September 10, 2016, Armanino's Project Manager Tim Hourigan represented to ATCC, in an email he sent to Ralph Koch and George Vaseghi of ATCC dated Sept. 10, 2016, that "we are ready for go-live!" Armanino knew at the time that that representation was false, however, and/or made that representation with reckless disregard for its truth or falsity. In particular, Armanino was aware that major deficiencies in its work up to that point, and in the ERP system and hosting environment it had provided to ATCC, would make it impossible for the ERP system to successfully go-live, but Armanino deliberately concealed that fact in order to extract more money from ATCC and avoid having its Contract terminated for nonperformance.

#53981242_v6

53.     ATCC reasonably relied on Armanino's aforesaid representations and recommendations, and agreed to proceed with the Go-Live transition to the new ERP system on September 10, 2016. As soon as the System went live on that day, however, it began to suffer crippling outages, slowdowns, and performance failures. Repeatedly, users were unable to even access the System through the hosting environment that Armanino had created, and when they could access it, it simply did not perform as it had in the user acceptance tests that Armanino had directed prior to the Go-Live attempt.

54.     In particular, ATCC's ordering and supply chain functions were severely and adversely impacted by this problem, resulting in substantial delays in customer shipping. New orders could not be accepted, recorded or fulfilled, and the backlog of existing unfulfilled orders at ATCC exploded. The most acute problems were in the areas of Order Intake, Order Processing, Order Release, Picking & Packing, and Shipping.

55.     Among other things, (i) the Order Intake process for orders received by fax (known as Esker) could not be automated or integrated into the System, requiring that those orders be handled manually; (ii) the Order Processing programs in the System were unable to automatically issue order confirmations to the customer, unable to automatically calculate a shipping date for the orders, and unable to accurately calculate shipping charges; (iii) the Release and Pick/Pack processes were unable to run material requirements planning ("MRP") batch programs to manage and plan for the fulfillment of inventory needs, were unable to generate batch numbers at the point of order entry that would appear on the picking and shipping documents, and were unable to identify cancelled orders before picking; and (iv) the Shipping processes were unable to prepare shipping confirmations, unable to prepare international Federal

Express labels for the packages to be shipped, and were unable to automatically post closed shipments. It was a crisis.

56.    On September 21, 2016, ATCC's CFO Ralph Koch complained to Armanino partner Bruce Kirschenbaum, in an email sent at approximately 10:58 A.M. that day, that

> We are continuing to experience a large number of critical performance issues and it is taking way too long to get closure on these. The software was advertised by your team as being ready to go live but clearly is not doing well. You must bring additional resources to bear on these issues as we are in danger of defaulting on some major customer contracts! I need for you to present me with a get well plan that closes w/in the next 24 hours."

In response, instead of admitting, as he knew, that the ERP system Armanino had supplied was, as he admitted months later, not ready to go live in September 2016, and was severely deficient, Mr. Kirschenbaum reassured Mr. Koch and represented that everything was normal, in an email he sent back to him on September 22, 2016, in which he said, inter alia:

> We are in the middle of stabilization as we have said many times – this process is natural and will take several weeks to gain a smooth operation from procurement to production to sales to distribution. Two weeks after go live I know it is still a struggle but you are on the road to stabilization. The solution is a combination of people getting familiar with the software, ensuring the process is as streamlined as possible and many will be tweaked to achieved that compression, in addition to solving any software related issues."

These representations by Mr. Kirschenbaum of Armanino at that time were false and misleading, and were known by him and by Armanino to be false and misleading. Armanino deliberately made these misrepresentations to ATCC in an effort to cover up and conceal the material fact that the ERP system Armanino had delivered was fundamentally defective as described herein..

57.    Armanino's partner Mr. Kirschenbaum also misrepresented, in an October 25, 2016 email to ATCC's Ralph Koch, that major problems with the RDS Server on the ERP system were ATCC's fault, and "could have been avoided with ATCC IT response," when in

fact Armanino knew that the problems were attributable to deficiencies in Armanino's implementation of the new ERP system it was providing. He also misrepresented, in an November 9, 2016 email, that "Our commitment to helping ATCC has never wavered," and that Armanino was "[a]lways willing to help you in the company's endeavors," when in fact Armanino was cutting back on its support for ATCC, was not assigning personnel with the required expertise and experience to deal with the crisis at ATCC, and did not intend to do so in the future.

58.   Mr. Kirschenbaum also misrepresented, in another November 9, 2016 email responding to ATCC's questions about certain problems with an RDS server in the ERP system,, that "We're figuring out as we speak what's going on with today's issue. Yesterday's issue you guys caused with not putting the correct firewall rules in place, thus messing up the trust – so that one is not on us." when in fact Armanino already knew or had reason to know that the problems concerning the RDS server were attributable to deficiencies in Armanino's design of the ERP system it had supplied, and were not ATCC's fault. Mr. Kirschenbaum also misrepresented, in another November 9, 2016 email, that "there is a bug in the RDS connection," which he blamed on Microsoft, when in fact, Armanino knew that there was no "bug," rather there was an update from Microsoft that Armanino had failed to implement in the ERP system, that caused the RDS connection problem.

59.   On October 19, 2016, Armanino's Project Manager Timothy Hourigan misrepresented that Armanino would shortly be able to "declare victory on the design" of the portion of the ERP system called "Esker" that was supposed to accept and help process fascimile orders, when in fact Armanino knew it could not do so. Mr. Hourigan then repeatedly misrepresented that ATCC was at fault for multiple problems with the performance of ERP

system when Armanino knew it was not, and that in fact it was the deficient quality of Armanino's work, as further described below, that was causing the problems.

60.     These and other misrepresentations by Armanino continued into December of 2016. Specifically, when Jim Kramer of ATCC wrote to Armanino, in a letter dated December 9, 2016 stating

> We also wish to formally notify Armanino that ATCC has suffered significant damage in operations as a direct result of this implementation. ... this has resulted in significant and ongoing negative impact on our finances and customer relations. Many of our customers have left or threatened legal action. Our staff must contend with customer complaints about delivery delays, inadequate training and an unstable system with performance issues. Quite often, code updates submitted by Armanino are late, do not work in production and must be reworked and resubmitted two or three times. ATCC has then been billed by Armanino for both the failed code and the rework(s). Damages to ATCC also impact the life science community at large. ATCC's offerings are instrumental to the ongoing pursuit of medical research and the development of new medicines, devices and diagnostics. This also extends to the public health sector, where we often help deal with public health emergencies such as those created by Influenza and Zika virus outbreaks..."

Armanino partner Bruce Kirschenbaum responded by misrepresenting that "The uptime on your live environment has actually been very good," which was not true, and again placing the blame on ATCC for problems that Armanino knew were its fault.

61.     Despite repeated appeals to Armanino for help in resolving these problems in the Fall of 2016, Armanino made little progress in resolving them for weeks and months thereafter, and as a result ATCC's business plummeted during the last quarter of 2016. As a result, ATCC's revenues, and its reputation and prospects for advantageous economic relationships in the future with its actual and prospective customers, and its distributors, suffered enormously – as evidenced in part by the fact that during that period, ATCC received a steadily increasing volume of communications from its customers and distributors desperately complaining about

ATCC's inability to receive, process and ship their orders, and repeatedly advising that as a result they would be reducing or stopping their orders from ATCC, and looking for alternative sources for the relevant biological products.

62.     On Sept. 30, 2016 , for example, one customer emailed to ATCC that for weeks, it had been "attempting to purchase DNA from two cell lines for our NIH funded work," had been unable to do so, needed "a realistic plan for getting these DNA," and that "[i]f that cannot be obtained, I will contact the appropriate parties to minimize the likelihood of reliance on your organizations in our future business plans."  On October 20, 2016, for example, a distributor of ATCC products emailed to ATCC that it was "not going to be accepting any new orders from our customer base" until the problem of what by then was a backlog of unfulfilled orders for ATCC products was "brought to an acceptable and current level."

63.     On November 1, 2016, by way of further example, another ATCC customer, a research and development scientist in the private sector, emailed to complain to ATCC about her "severely delayed orders," stating "I understand, due to implementation of new ordering system in ATCC, all orders delayed" but that "I desperately need these cell lines and our project is horribly delayed."  On November 10, 2016, another ATCC customer, the senior buyer in a surgical company, similarly complained about orders that were months overdue, emphasizing that "[w]e have been ordering from your company for years and my fear is that this is the new norm..."  On November 15, 2016, another consumer of ATCC products, a researcher in the biology department of a major U.S. university similarly complained that "I understand your company implemented a new system that is not working, but we are in desperate need of our order.  We are great customers and need to have at least a partial order sent to us ASAP.  We are losing thousands of dollars a day without this item.  Experiments have come to a standstill....".

64.     Also on November 15, 2016, a faculty investigator at a leading biotech institute whose cell line order had been delayed for months as a result of the failed ERP system implementation emailed ATCC that their order of September 9 to ATCC, placed one day before the disastrous Sept. 10 Go-Live with the Armanino system, was still unfulfilled, and that the "experience with your company has been simply unacceptable…." and stating "We are one of the largest sequencing centers in the US and we are actively working to translate human sequencing data using various cell lines.  The cell line order we placed with you is a crucial one and any further delay on your end could jeopardize our program.  If you value our current and future business, you will expeditiously work to rectify this situation…."

65.     On November 16, 2016 ATCC received still more complaints from a post-doctoral researcher at a major university, and a pharmaceutical company, and the complaints went on and on for weeks and months thereafter, as Armanino repeatedly misrepresented that it would fix the problems in its ERP system that it had delivered to ATCC, and then repeatedly failed to do so, for reasons which ATCC did not understand.  Multiple additional customer complaints, similar to those quoted above, were received by ATCC, for example, on November 16, 18, 23, 29; on December 5, 6, 7, 8, 9, 12, 13, 14, 16, 19, 20, 21, 23, 27, 29; and throughout the months of January and February 2017.  This was a monumental crisis for ATCC.

66.     Armanino was fully aware, before the attempted Go-Live on September 10, 2016, and thereafter, that ATCC would suffer this kind of enormous damage to its reputation and standing in the industry and its customer base if the new ERP system Armanino was providing could not function properly.  Nevertheless, Armanino misrepresented that the system was ready to Go Live on Sept 10 as aforesaid, and thereafter, when the system failed, Armanino failed to respond properly to this crisis, and instead of revealing what it knew about the true causes of it,

#53981242_v6

made excuses, attempted to shift the blame to ATCC, and misrepresented that it could and would solve the problems, when it knew it could not and would not. In particular, Armanino was aware that major deficiencies in its work up to that point, and in both the ERP system and hosting environment it had provided to ATCC, were what was making it impossible for the ERP system to function properly, but Armanino deliberately concealed that fact in order to extract more money from ATCC and avoid having its contract terminated for nonperformance. Those deficiencies that Armanino knew about but concealed are described below.

67.     As a result of its inability to make any progress by relying on Armanino to solve the crisis caused by its ERP system not functioning properly, ATCC brought in independent ERP system experts, and promptly began working with them to examine the work Armanino had done, and the System it had provided to ATCC.

68.     By late 2016, expert analysis had confirmed that the problems with the System itself, when it could be accessed, had been caused by the severely deficient manner in which Armanino had designed, configured and implemented the System, including the fact that it had not actually followed the "proven" implementation methodology, based on Microsoft's "Sure Step" method, that Armanino had represented it would.

69.     Thereafter, other expert analysis confirmed that in addition to the problems with the application software in the System, the cloud-based environment infrastructure that Armanino had designed, and that Armanino had represented would be online and available at least 99.9% of the time on twenty-four (24) hours per day, seven (7) days per week basis, was dramatically undersized, not properly secured with the necessary firewalls, not properly configured at the appropriate patch levels across multiple virtual servers in the cloud, and not

properly connected to the ATCC internal network so that sign-on authentication and access protocols would work reliably.

70.    In this regard, Armanino had agreed in the Contract to provide "a totally integrated" hosting environment for ATCC's MAX system that would provide "24X7 - Constant coverage, 24 hours per day, 365 days per year," and would provide "[v]irtual and/or physical servers that would "meet the customer's requirements." It had also agreed to provide "[f]irewall administration" "[c]onnectivity" between ATCC and its datacenter "through internet or VPN," and "Operating system patches management," "Security management services," "Capacity planning," and "SQL Server software patching." – all "in a professional and workmanlike manner conforming to generally accepted industry standards" as required by its Master Services Agreement with ATCC.

71.    Beginning several months after the failed Go-Live in September 2016, however, and continuing further after Armanino was discharged, ATCC's experts were shocked to discover, as a result of analyzing the causes of the outages, slowdowns, and performance failures in the MAX system, that a huge part of the problem was that it was effectively impossible to consistently maintain connectivity to the System, and still perform all the functions that ATCC needed it to perform, because the hosting environment that Armanino had designed and created was fundamentally misdesigned, in that, among other problems,

      a.  it had less than half the capacity required for a properly sized hosting environment (i.e. far too little server capacity),

      b.  it was designed for and using only standard storage disks instead of industry best practice premium storage disks,

      c.  it lacked proper firewall protections,

      d.  its virtual servers were running operating software that was not at the correct and/or current patch levels,

38

e.  its virtual servers running in parallel were improperly running at different patch levels, and

f.  there was a complete lack of the proper connectivity to outside authentication facilities that was necessary to enable licensed ATCC users to sign on to the MAX system without repeated delays.

72.  Further investigation revealed that Armanino had assigned an inexperienced and unqualified individual to be the lead Systems Engineer of the host environment for ATCC's System. At the time, although Armanino represented to ATCC that this individual was a "Senior Systems Engineer," in fact he had just graduated from college the previous year and had very little experience or competence independently designing host environments for the MAX system at the level of complexity required by the ATCC project. This individual's assistant, who Armanino also represented to ATCC was a "Senior Systems Engineer," was similarly inexperienced and unqualified. In fact, he was a recent high school graduate who also had little prior experience with or competence in Microsoft AX-based ERP implementations.

73.  ATCC in-house personnel and outside experts who examined the Microsoft Azure environment that Armanino has designed after the failed Go-Live in September 2016 found that it had major design deficiencies. ATCC's Director of Shared Services, for example, who became involved with the recovery effort after the failed Go-Live attempt in September 2016, identified many fundamental deficiencies in the cloud-based environment that Armanino created for ATCC's MAX system to run on – including the fact that it was not operating an anti-virus system at all, had no firewalls or filtering in place, and had major RDP server and instability problems due to what appeared to be fundamental design flaws.

74.  Thereafter, another independent expert group identified other major problems with the Armanino-designed hosting environment, including notable lack of basic system

39

stability and reliability and inadequate testing of the operational environment, and severely deficient advice on when a Go Live transition could safely be attempted in that environment. It also noted that Armanino had failed to provide adequate test and development facilities in the form of additional server capacity for separate test and development environments.

75.     All of these observations led ATCC to retain an independent hosting environment expert, Concerto Cloud Services ("Concerto"), to further investigate the situation, and to attempt to remediate the Armanino-designed host environment so as to try to bring it as close as possible into compliance with generally accepted industry standards.

76.     In attempting to do so, beginning in early 2017, Concerto identified still more problems with the hosting environment that Armanino designed and implemented, including inadequate and substandard server capacity, disk storage, security protocols, processing and operational design features, and a complete lack of the documentation required to certify the system as compliant with Good Manufacturing Processes (GMP). The situation was so bad that in early 2017, Concerto had to perform significant remedial measures on the deficient Armanino hosting environment in order to stabilize it sufficiently to work to even a minimal threshold of performance.

77.     Specifically, Concerto was required, *inter alia*, to perform the following remedial tasks in an effort to stabilize the Armanino-created host environment sufficiently to enable the MAX system running on it to perform the most basic functions:

    a.  Concerto had to bring Windows Servers in the host environment up to the most recent patch level to ensure all Operating System performance and security fixes were in place, as Armanino had failed to do this, which was a clear departure from both generally accepted industry standards and industry best practices;

    b.  SQL Updates had to be initiated by Concerto because Armanino's deficient hosting environment had two SQL systems running different patch levels, which was a clear departure from generally accepted industry standards and increased the likelihood of

SQL problems in the system. (Concerto had to patch the SQL application so that both SQL Machines were on the same build and same patch levels of SQL.);

c. Concerto had to build and deploy additional RDS Servers to reduce the load on the original Armanino-designed RDS server set-up, which had as many as 90 concurrent users per RDS server, which violated generally accepted industry standards and industry best practices for MAX systems which dictate that the maximum number of concurrent users should be only 25 concurrent users per RDS Server;

d. Concerto had to replace the standard Azure storage disks that Armanino had used for the environment servers with industry standard premium storage disks, because Armanino's use of standard storage violated generally accepted industry standards and industry best practices for MAX systems;

e. Concerto had to correct the deficient licensing and sign-on communications protocols so that users could properly sign on and be authenticated as licensed users, which Armanino had failed to design for;

f. Concerto built additional development servers to stabilize the development environment, which Armanino had failed to provide for, resulting in severely deficient testing; and

g. in order to properly monitor and proactively manage the environment, SCOM and SQL Sentry Reporting were deployed by Concerto, again in accordance with industry best practices that Armanino had essentially ignored, to ensure operational visibility into all aspects of the Windows Operating System; and the AX application, and SQL Server. AX, SQL, SQL Cluster, and Windows management packs were installed, configured, and tuned to enhance the operational visibility, root cause analysis, and monitoring of the environment.

78.    Concerto has recorded all of these remediation efforts, and the technical details of all the deficiencies it found in the Armanino host environment, in a series of electronic records that it has provided to ATCC, including Change Control Records listing all changes or additions to the environment, and a so-called "DAIR" Log listing the various decisions, actions, and risks it has taken and identified so far.

79.    Concerto has also identified substantial additional work that still needs to be done to the host environment to bring it into conformity with generally accepted industry standards for an operation of ATCC's size and complexity – including rebuilding it so as to completely isolate

41

the development and test environments from the operational environment, moving it to the Azure East region instead of the Azure West region, incorporating a File Share witness for the SQL cluster per best practice to ensure proper failover; and implementation of Express Route added for a faster connection.

80.     Concerto has further determined, however, and ATCC has confirmed, that in order to permit ATCC's entire ERP set-up (including both the MAX system and its hosting environment) to be certified as compliant with modern industry standard Good Manufacturing Practices (GMP), which Armanino expressly represented and contracted that the system would be compliant with, an entirely new host environment has to be created because when the Armanino-designed host environment was being designed and built, Armanino simply failed to create the necessary documentation of that process, with the result that it can never be GMP certified.

81.     In addition to the fundamental undersizing and misdesign of the hosting environment, Armanino failed to follow industry standard implementation methodology in designing, testing, training people on, and then implementing, the MAX System at ATCC that was supposed to run in the hosting environment.

82.     Among other things, that methodology required adherence to high standards for detailed fit/gap analyses of the client's ERP system needs; careful documenting and control of software code development, changes, and customizations; comprehensive unit and system testing prior to Go-Live; thorough data cleaning, conversion and testing; and satisfaction of rigorous standards prior to Go-Live, and realistic training, performed with real data in a variety of business scenarios, prior to any Go-Live.

42

83.    When they began to examine and analyze the extensive difficulties that ATCC personnel were having with the MAX system after the failed Go-Live attempt, ATCC's experts found that Armanino's work clearly had not met these standards in a wide variety of Project management areas, including the determination of basic ATCC requirements for purposes of preparing a realistic Fit-Gap analysis, adherence to industry standard Business Process Mapping protocols; adequately planning for, managing, and resourcing the overall system testing and ATCC personnel training programs; adequately resourcing the data conversion effort with experienced and capable personnel; and properly advising on Go-Live decisions.

84.    They also found, when they began to examine Armanino's use of subcontractors for custom code development, that Armanino failed to properly supervise and direct their activities, require proper documentation of their code development, or to otherwise take responsibility for their work – which it was obliged to do.

85.    The consulting firm T2C also identified other major problems with Armanino's work immediately after the failed Go-Live attempt in September 2016, including notable lack of system stability and reliability, consistently late delivery of inadequately tested and poor quality customized code, inadequate and poor quality training, insufficient planning and organization of end to end user acceptance testing of code, and inadequate advice on when a Go-Live transition could safely be attempted.

86.    It also identified serious failures by Armanino to properly convert and test ATCC data for use on the MAX system before attempting to go live, and lack of sufficient advance testing, and therefore significant deficiencies, in two key software areas – sales order processing and supply chain activities.

87.    All of these observations led ATCC, in early 2017, to retain an independent Microsoft AX implementation expert, Edgewater Fullscope ("Fullscope") – a wholly-owned subsidiary of Edgewater Technology, Inc. (NASDAQ: EDGW) and a leading provider of Microsoft Dynamics AX and CRM solutions to manufacturers – to further investigate the situation, and to attempt to remediate the MAX system that Armanino had customized for ATCC, installed into the deficient Armanino host environment, and attempted to assist ATCC in implementing. A team of experts from Fullscope have been working since that time to remediate the deficiencies in the customized software and software configurations that Armanino built into ATCC's MAX system, and it has been a laborious task.

88.    A review of the extensive remediation work conducted by Fullscope on the MAX system that Armanino created clearly shows that many key functions in it were not designed or working properly, including the critical Material Requirements Planning ("MRP") batch processing that was supposed to analyze all the data in the system on a periodic (usually weekly) basis and accurately forecast ATCC's procurement requirements. Moreover, as to the MRP processing component of the system, Armanino repeatedly and falsely represented, during the post Go-Live period when ATCC was trying to function with the deficient ERP system that Armanino had provided, that "it's coming," when in fact Armanino had no basis for saying that, and knew that the personnel it had assigned to develop the MRP code had no competence to do so, and were literally trying to "learn by doing" at ATCC's risk and expense.

89.    Fullscope also found that the custom software Armanino had delivered and installed in the system made excessive use of so-called "hard coding," was not properly documented in accordance with generally accepted industry standards for software development, and that version of Microsoft AX that Armanino had used in the MAX system was not properly

44

configured for use with ATCC data.  Fullscope has since been working steadily to remediate the code to bring it into compliance with industry standards, and has kept detailed records both of what it has found in the Armanino code and what changes it has had to make in it to make the MAX system work more acceptably.

90.    These records, and the observations of the experts who have actually examined and made necessary changes to the Armanino-supplied system in 2017, completely corroborate the claims of ATCC's personnel that the Armanino-designed ERP system was simply unworkable when the first Go Live was attempted in Sept. 2016, and contained serious software code and configuration deficiencies that continued to plague the system for months thereafter.

### *Damages*

91.    ATCC has suffered and continues to suffer enormous harm and damages as a result of Armanino's aforesaid misconduct, including, but not limited to,

    a.  at least $6.5 Million of lost gross margin during the calamitous post-September 2016 Go-Live period;

    b.  at least $1.4 Million in wasted payments to Armanino during the period 2016-17;

    c.  at least $1.0 Million in internal ATCC production operation losses, including significant overtime and temporary employee costs to deal with the crisis situation and onslaught of customer calls and complaints due to lack of product shipping on time or correctly;

    d.  at least $1.3 Million in remedial work payments to outside vendors Concerto ($453,153 through 6-30-17), Fullscope ($894,442 through 6-21-17);  T2C ($450,000), Dialog Direct, and others.;

    e.  at least another approximately $1.5 Million that will have to be spent to create an entirely new and properly documented hosting environment to comply with Good Manufacturing Process (GMP) certification requirements that Armanino represented it would comply with but did not –

*i.e.* a total of approximately $12.15 Million, plus at least another $20 Million in long term damages to ATCC's customer and distributor relationships, and loss of prospective economic

advantage in the future, directly resulting from Armanino's aforesaid misconduct, which has severely and permanently damaged ATCC's business.

92.     ATCC also seeks exemplary and punitive damages in the amount of at least three (3) times its actual damages, plus recovery of all of its litigation costs and attorneys' fees.

## CAUSES OF ACTION

### COUNT I
### (Fraud in the Inducement)

93.     ATCC hereby incorporates by reference, as though fully set forth herein, the allegations contained in all the other paragraphs of this Complaint.

94.     Armanino made the misrepresentations to ATCC set forth herein, including those described in paragraphs 3, 8-9, and 25-38 of this Complaint, knowing that they were false and that it did not intend to provide all the services it was representing it would provide at the level of quality or in the timeframe it was representing they would be provided, and/or made those representations with reckless disregard for their truth or falsity.

95.     Armanino made the misrepresentations to ATCC set forth in paragraphs 3, 8-9, and 25-38 of this Complaint knowing and intending that ATCC would rely on them in deciding whether to enter into the Professional Services Contract with Armanino, and in order to fraudulently induce ATCC to enter into a long-term Professional Services Contract with Armanino.

96.     ATCC did in fact reasonably rely on the written false representations of ATCC set forth in paragraphs 3, 8-9, and 25-38 hereof to its detriment in deciding to enter into the Professional Services Contract with Armanino, and as a result was in fact fraudulently induced to enter into that Contract.

97.     As a result of being fraudulently induced to enter into the Contract as aforesaid, ATCC has suffered and continues to suffer substantial damages that it has the right to recover from Armanino.

98.     ATCC also has the right, as a result of being fraudulently induced to enter into the Contract as aforesaid, to rescind the Contract and recover all amounts paid under it, plus damages, from Armanino.

**COUNT II**
**(Fraudulent Concealment & Misrepresentation)**

99.     ATCC hereby incorporates by reference, as though fully set forth herein, the allegations contained in all the other paragraphs of this Complaint.

100.    In addition to the false representations in paragraphs 3, 8-9, and 25-38 hereof, Armanino also made false representations to ATCC during the Project, and fraudulently concealed material facts from ATCC during the Project when it had a duty to disclose them, as described in paragraphs 47-53 and 56-61 of this Complaint.

101.    Armanino made these misrepresentations to ATCC during the Project knowing and intending that ATCC would rely on them, and ATCC did in fact reasonably rely on them to its detriment. Armanino also concealed the aforesaid information from ATCC knowing that it had a duty to disclose it to ATCC, all to ATCC's detriment.

102.    As a result, ATCC has suffered and continues to suffer substantial damages that it has the right to recover from Armanino.

103.    ATCC also has the right, as a result of the foregoing, to rescind the Contract and recover all amounts paid under it, plus damages, from Armanino.

#53981242_v6

## COUNT III
### (Negligent Misrepresentation)

104.    ATCC hereby incorporates by reference, as though fully set forth herein, the allegations contained in all the other paragraphs of this Complaint.

105.    Armanino made the false representations to ATCC set forth in paragraphs 3, 8-9, 25-38, 47-53, and 56-61 and of this Complaint negligently, without taking reasonable steps to determine whether they were truthful or not.

106.    Armanino made the false representations to ATCC set forth in paragraphs 3, 8-9, and 25-38 of this Complaint negligently, without taking reasonable steps to determine whether they were truthful or not, in order to induce ATCC to enter into a long-term Professional Services Contract with Armanino.

107.    ATCC did in fact rely on the false representations of ATCC set forth in paragraphs 3, 8-9, 25-38, 47-53, and 56-61 hereof in deciding to enter into the Professional Services Contract with Armanino, and as a result was in fact negligently induced to enter into that Contract.

108.    As a result of being negligently induced to enter into the Contract as aforesaid, ATCC has suffered and continues to suffer substantial damages that it has the right to recover from Armanino.

109.    ATCC also has the right, as a result of being negligently induced to enter into the Contract as aforesaid, to rescind the Contract and recover all amounts paid under it, plus damages, from Armanino.

110.    In addition to the false representations in paragraphs 3, 8-9, and 25-38 hereof, Armanino negligently misrepresented facts to ATCC during the Project, and negligently

48

concealed facts from ATCC during the Project, as described in paragraphs 47-53 and 56-61 of this Complaint.

111.    Armanino made these negligent misrepresentations to ATCC during the Project knowing and intending that ATCC would rely on them, and ATCC did in fact reasonably rely on them to its detriment.  Armanino also concealed the aforesaid information from ATCC knowing that it had a duty to disclose it, all to ATCC's detriment.

112.    As a result, ATCC has suffered and continues to suffer substantial damages that it has the right to recover from Armanino.

113.    ATCC also has the right, as a result of the foregoing, to rescind the Contract and recover all amounts paid under it, plus damages, from Armanino.

<u>COUNT IV</u>
**(Professional Negligence)**

114.    ATCC hereby incorporates by reference, as though fully set forth herein, all the other paragraphs of this Complaint.

115.    Defendant Armanino owed plaintiff ATCC a duty of care to exercise reasonable care and skill in the performance of the professional services it had agreed to provide in the Contract, and to perform the Professional Services Contract with the reasonable care, skill and knowledge of similar professionals in the field.

116.    Armanino was negligent in that it failed to exercise reasonable care and skill in the performance of the professional services it had agreed to provide in the Contract.

117.    Armanino was negligent and grossly negligent in that it failed to perform that Professional Services Contract with the reasonable care, skill and knowledge of competent professionals in that field.

#53981242_v6

118.   Armanino's aforesaid negligence and gross negligence proximately caused and has continued to cause substantial actual damages to ATCC that ATCC is entitled to recover from Armanino.

119.   Armanino's aforesaid professional negligence and breaches of its duty of care to ATCC constituted not merely passive negligence or mere nonfeasance, but rather included active negligence involving affirmative acts, knowledge of or acquiescence in negligent conduct, and/or failure to perform specific duties.  Armanino's aforesaid conduct was also willful and wanton, and undertaken in malicious disregard of ATCC's rights.  As a result, ATCC is entitled to recover exemplary and punitive damages from Armanino.

## COUNT V
### (Negligent Interference With Prospective Economic Advantage)

120.   ATCC hereby incorporates by reference, as though fully set forth herein, all the other paragraphs of this Complaint.

121.   Prior to the Project, and prior to the failure of the Project Go-Live, a large number of advantageous economic relationships existed between ATCC and its customers and distributors which contained reasonably probable future economic benefits and/or advantages to ATCC.

122.   Defendant Armanino knew of the existence of the aforesaid advantageous economic relationships between ATCC and its customers and distributors both prior to and during the Project, and was aware or should have been aware that if it did not act with due care in connection with the Project its actions would interfere with these relationships and cause ATCC to lose in whole or in part the probable future economic benefits and/or advantages of those relationships.  Among other things, it was clearly foreseeable by Armanino that if it did not act with due care in connection with the Project, ATCC's ability to receive, process, and fulfill

50

orders for critically needed biological materials would be jeopardized, and that its economic and advantageous relationships with its customers and distributors all over the world would be seriously damaged.

123.    As set forth above, defendant Armanino was negligent, and grossly and actively negligent, in the performance of its services under the Professional Services Contract, and that negligence has caused and is causing severe damage to ATCC in that the aforesaid advantageous and/or economic relationships between ATCC and its customers and distributors have been actually interfered with and disrupted, and ATCC has lost in whole or in part a large amount of the economic benefits and/or advantages reasonably expected from those relationships.

124.    As a result of the foregoing, ATCC is entitled to recover from Armanino all the damages it has suffered as a result of the loss of the prospective economic benefits and/or advantages reasonably expected from those relationships.

## COUNT VI
### (Breach of Contract)

125.    ATCC hereby incorporates by reference, as though fully set forth herein, all other paragraphs of this Complaint.

126.    ATCC performed or substantially performed and satisfied all necessary conditions precedent or dependent obligations under the Professional Services Contract, including all payment obligations.

127.    Armanino breached the Professional Services Contract by, *inter alia*, failing to provide all of the services and deliverables required to be performed and delivered thereunder at the levels of quality and within the timeframes required thereby.

51

#53981242_v6

128.     Armanino's aforesaid breaches of its Professional Services Contract with ATCC proximately caused and are continuing to proximately cause ATCC to suffer substantial damages, which ATCC is entitled to recover from Armanino in this action.

**COUNT VII**
**(Breach of Warranty)**

129.     ATCC hereby incorporates by reference, as though fully set forth herein, all other paragraphs of this Complaint as if fully set forth herein.

130.     Armanino breached its warranties to ATCC by failing to provide all of the services and deliverables that it had warranted it would provide, at the levels of quality and within the timeframes that it warranted they would be provided.

131.     Among other things, Armanino expressly warranted, in the Contract, that it would provide all its services "in a professional and workmanlike manner," and that all the services it would deliver to ATCC in connection with the Project would "conform[] to generally accepted industry standards." Armanino breached that warranty by *inter alia*, repeatedly providing services that did not conform to generally accepted industry standards.

132.     Armanino's aforesaid breaches of its warranties to ATCC proximately caused and are continuing to proximately cause ATCC to suffer substantial damages, which ATCC is entitled to recover from Armanino in this action.

**COUNT VIII**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

133.     ATCC hereby incorporates by reference, as though fully set forth herein, all other paragraphs of this Complaint as if fully set forth herein.

134.     By virtue of its aforesaid acts and omissions, and other acts and omissions on its part, Armanino repeatedly breached the implied covenant of good faith and fair dealing arising out of its Professional Services Contract with ATCC.

52

135.    Armanino's aforesaid breaches of the implied covenant of good faith and fair dealing arising out of its Professional Services Contract with ATCC proximately caused and are continuing to proximately cause ATCC to suffer substantial damages, which ATCC is entitled to recover from Armanino in this action.

**COUNT IX**
**(Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200)**

136.    ATCC hereby incorporates by reference, as though fully set forth herein, all other paragraphs of this Complaint.

137.    The California Business and Professions Code Section 17200 et seq., also known as the Unfair Competition Law ("UCL"), prohibits unfair competition, including any unlawful, unfair, and/or fraudulent acts or practices, and any unfair, deceptive, untrue, or misleading advertising.

138.    By virtue of its aforesaid acts and omissions, including its false representations to and concealments of information from ATCC, Armanino has violated the UCL, Cal. Bus. & Prof. Code § 17200.

139.    ATCC has suffered actual injury and has lost money or property by virtue of ATCC's unlawful and fraudulent acts, and is entitled under the statute to rescind the Contract and recover all amounts paid by it to Armanino thereunder, plus appropriate injunctive relief, and all of its litigation costs, including attorneys' fees, in this action.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff ATCC respectfully requests that the Court enter judgment in its favor and award it the following relief:

1.     all of its compensatory damages, including all of its consequential damages;

2.     exemplary damages on account of Armanino's aforesaid misconduct;

53

3.      punitive damages on Armanino's aforesaid misconduct;

4.      all of its litigation costs herein, including attorneys' fees; and

5.      such other and further relief as this Court may deem just and proper, or as to which ATCC may show it is entitled at trial.

## JURY DEMAND

**ATCC HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED:  October 30, 2017                     Respectfully submitted,


*/s/ Brandon H. Elledge*
Brandon H. Elledge (VSB#:  45349)
HOLLAND & KNIGHT LLP
1650 Tysons Boulevard, Suite 1700
Tysons Corner, Virginia  22102
Telephone:      (703) 720-8015
Facsimile:      (703) 720-8610
brandon.elledge@hklaw.com


Robert J. Kaler
HOLLAND & KNIGHT LLP
10 St. James Avenue
Boston, MA  02116
Telephone:      (617) 854-1443
Facsimile:      (617) 523-6850
robert.kaler@hklaw.com
*Pro Hac Vice* Motion Pending


*Counsel for Plaintiff ATCC*

54